(72 P.3d 937)
No. 90,452

RURAL TELEPHONE SERVICE COMPANY, INC., *Petitioner,* v.
KANSAS CORPORATION COMMISSION, *Respondent.*

Opinion filed July 18, 2003.

*Mark E. Caplinger* and *James M. Caplinger,* of James M. Caplinger, Chartered, of Topeka, for appellant Rural Telephone Service Company, Inc.

*Anne E. Bos* and *Eva Powers,* assistants general counsel, *Susan B. Cunningham,* general counsel, of Topeka, for appellee Kansas Corporation Commission.

*Thomas E. Gleason, Jr.,* of Gleason & Doty, Chartered, of Lawrence, for intervenor Independent Telecommunications Group.

Before JOHNSON, P.J., PIERRON and GREEN, JJ.

JOHNSON, J.: Rural Telephone Service Company, Inc. (Rural) appeals from the final order of the Kansas Corporation Commission (KCC or Commission) which approved Rural's revised rate tariffs, but which also reduced the payments Rural receives from the Kansas Universal Service Fund (KUSF) in order to offset the increased revenue the Commission estimated would be generated by the revised tariffs. We reverse and remand for further proceedings.

Rural is a rate of return KCC-regulated class B telephone utility having less than 20,000 access lines. Rural commenced the case now before us by filing an application for revised tariffs, pursuant to K.S.A. 66-117, which requires all regulated public utilities to file changes in rates, tolls, charges, etc., at least 30 days prior to the proposed effective date of the change. Rural's filing proposed an

increase to certain service charges (*e.g.*, line connection and reconnection charges), an addition of certain calling features (*e.g.*, telemarketer block), an increase in the cost of some existing calling features (*e.g.*, voice mail), a decrease in the cost of some existing calling features (*e.g.*, automatic redial), and an addition of a package of calling features offered at a discounted price. The KCC stayed the effective date of the proposed changes and commenced an investigation. Ultimately, the KCC considered the tariff application in the context of its prior actions involving Rural's rates and subsidies, thus requiring a brief historical recitation to fully understand the appeal issue presented.

The controversy on appeal involves the KCC's implementation of the Kansas Telecommunications Act of 1996 (KTA), K.S.A. 66-2001 *et seq.*, which was enacted shortly after the Federal Communications Act of 1996, 47 U.S.C. § 151 *et seq.*, effected a deregulation of the telecommunications industry. Traditionally, local exchange carriers (LECs) subsidized the cost of local telephone services through higher intrastate access and toll charges. The KTA required that "[r]ates for intrastate switched access, and the imputed access portion of toll, shall be reduced over a three-year period with the objective of equalizing interstate and intrastate rates in a revenue neutral, specific and predictable manner." K.S.A. 66-2005(c). The KCC was authorized to rebalance local service rates to help offset the intrastate access and toll charge reductions, but the KTA also created the KUSF to subsidize that portion of the mandatory reductions which was not offset by local service increases, thus ameliorating the impact on local service customers.

All telecommunication carriers contribute to KUSF in a manner prescribed by the KCC and then KUSF monies are distributed to qualifying telecommunications carriers to help defray financial losses caused by the deregulation process. K.S.A. 66-2008(b). At first, KUSF was based on the actual revenues lost because of the mandatory reductions. K.S.A. 1996 Supp. 66-2008(a). Subsequently, the fund became cost-based and the amended statutory provision required that by 2006, all KUSF support was to be based on each carrier's "embedded costs, revenue requirements, investments and expenses." K.S.A. 66-2008(e); see *Citizens' Utility Rate-*

*payer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363, 385, 956 P.2d 685 (1998) (revenue neutrality provisions of KTA are transitional; KCC may consider costs). In other words, KUSF support would be based on each carrier's specific revenue requirements as determined by that carrier's actual circumstances, rather than simply calculating the revenues the carrier lost because of the deregulatory rate rebalancing. This methodology assures that each LEC receives only the amount of subsidy it needs and precludes a windfall to those LECs that are using noncompetitive services to subsidize the services subject to competition.

In 1999, the KCC began the KUSF cost-based review process by initiating a docket to determine how to calculate appropriate cost-based payments from KUSF to Sprint and Southwestern Bell Telephone Company (SWBT), the two largest KUSF recipients. The KCC delayed review of KUSF payments to rural LECs pending further action of the Federal Communications Commission (FCC). In September 2000, the KCC began its review of KUSF payments to Rural, which was receiving the third largest KUSF distribution, after Sprint and SWBT. To complete the KUSF audit, the KCC ordered Rural to supply detailed information on costs, revenues, and rates based on a test year ending December 31, 1999. The audit resulted in a determination that Rural was overearning by $723,614 and the KCC's June 25, 2001, order reduced Rural's KUSF payments accordingly. This order was not appealed.

In January 2002, Rural filed an application with the KCC for supplemental KUSF funding (supplemental KUSF proceeding). Rural's application purported to show that the company had invested over 12 million dollars in its physical plant after the 1999 audit docket test year. KCC's Staff opposed Rural's application, claiming the application was an attempt to circumvent rate case regulation through an improper vehicle. The KCC agreed and dismissed the application without a hearing on May 8, 2002. Rural apparently did not appeal this dismissal.

Also in January 2002, Rural filed a petition under K.S.A. 66-2007 seeking to increase its base service rates by $1.50 per line (rate docket). Under K.S.A. 66-2007, the KCC had no discretion to reject the rate increase unless at least 15% of Rural's customers

objected to the increase. The KCC ultimately approved the requested rate increase on April 23, 2002. In its order, the KCC noted it was concerned that Rural's petition was filed so quickly after the completion of Rural's audit docket. It indicated that although it could not adjust KUSF support in conjunction with this rate change, it would "consider the impact of this increase on the KUSF in relevant dockets that are pending or are opened in the future."

On May 9, 2002, shortly after the approval of its local service rate increase and the dismissal of its request for supplemental KUSF, Rural filed the subject tariff application (tariff docket). KCC Staff sent Rural's counsel a letter dated June 6, 2002, advising Rural that due to the close proximity of the tariff application to the recent audit, any rate changes in the tariff had to be revenue neutral, absent a showing that extra revenue was necessary. The correspondence included requests for information on how many customers subscribed to existing services and how many customers Rural anticipated would subscribe to new services.

On June 7, 2002, the KCC suspended the effective date of the tariff for 240 days, finding that a full investigation of the application was warranted. See K.S.A. 66-117. The suspension order made no mention of the potential for KUSF adjustments. Other than the data requests relating specifically to the tariff application, the KCC did not order or request information about Rural's costs, expenses, or revenue requirements.

On September 30, 2002, KCC Staff submitted a memorandum to the Commissioners, noting Rural's recent local exchange rate increase and indicating that the proposed tariff would increase Rural's annual revenue by $60,984. Pointing to the prior reduction in Rural's KUSF support in the audit docket, the Staff suggested Rural would again be over-earning because of the projected increased revenues from the revised tariff. Accordingly, Staff recommended the KCC approve Rural's tariff subject to a corresponding decrease in Rural's KUSF payments to offset the additional revenue generated by the revised tariffs.

On October 9, 2002, the KCC entered its order in conformance with Staff recommendations. The order specifically found and concluded that the tariff revisions were reasonable.

On October 18, 2002, Rural filed a timely petition for reconsideration, which was denied by order, dated November 7, 2002. On December 6, 2002, Rural filed a timely petition for judicial review in the Graham County District Court. Rural asserted that the KCC's order was a nonrate hearing order properly appealed to the district court, that the KCC lacked authority to reduce its KUSF funding because such an adjustment can only be effected in an audit or general rate case investigation, and that the KCC's actions were unlawful, unreasonable, arbitrary, and capricious. In January 2003, the KCC filed a motion to transfer and a motion to dismiss in response to Rural's petition for judicial review. The KCC asserted that because Rural's application called for rate increases and resulted in the reductions of Rural's KUSF payments, the KCC's orders constitute rate orders; therefore, the matter should be transferred to the Court of Appeals pursuant to K.S.A. 66-118a(d). Rural opposed the motion. Following a hearing and after taking the matter under advisement, the district court transferred the case to the Court of Appeals as a "rate hearing." On appeal, Rural does not challenge the transfer.

The case was docketed in this court on April 3, 2003. The Independent Telecommunications Group, Columbus, *et al.*, a consortium of rural telecommunications companies, was allowed to intervene.

In its brief, Rural contends that the KCC acted unlawfully and unreasonably. Specifically, Rural contends that the KCC engaged in unlawful single-issue rate making when it reduced the KUSF payment outside the context of a general rate case and that the KUSF reduction was not based on substantial competent evidence. Although Rural suggests that it was unaware that the KCC was considering a reduction in its KUSF payments until the tariff docket order was issued, Rural indicated at oral argument that it was not relying on a notice issue.

Pursuant to K.S.A. 66-118c, this court's review of an order of the KCC is in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* Rural's contentions that the KCC acted unlawfully and/or unreasonably and that the Commission's order is not supported by sub-

stantial evidence are permissible KJRA claims of error. See K.S.A. 77-621.

An order of the KCC is " ' "lawful" if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. [Citation omitted.]' " *Farmland Industries, Inc. v. Kansas Corporation Comm'n,* 24 Kan. App. 2d 172, 175, 943 P.2d 470, *rev. denied* 263 Kan. 885 (1997) (quoting *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380, 595 P.2d 735, *rev. denied* 226 Kan. 792 [1979]). A KCC order is considered " ' "reasonable" if it is based on substantial competent evidence. [Citation omitted.]' " 24 Kan. App. 2d at 175 (quoting 3 Kan. App. 2d at 380). The KCC's action is arbitrary and capricious if it is unreasonable or without foundation in fact. *Farmland Industries, Inc. v. Kansas Corp. Comm'n,* 25 Kan. App. 2d 849, 852, 971 P.2d 1213 (1999).

To the extent Rural asserts the KCC acted outside its statutory authority in making the KUSF adjustment, we apply the standard of review for interpreting statutes. The interpretation of a statute by an administrative agency which is charged with the responsibility of enforcing that statute is generally entitled to judicial deference, and if there is a rational basis for the agency's interpretation, it should be upheld on judicial review. *Southwestern Bell Tel. Co. v. Kansas Corporation Comm'n,* 29 Kan. App. 2d 414, 418, 29 P.3d 424 (2001). Although this court gives deference to the agency's interpretation of a statute, the final construction of a statute lies with the appellate court; the agency's interpretation, while persuasive, is not binding on the court. *In re Appeal of United Teleservices, Inc.,* 267 Kan. 570, 572, 983 P.2d 250 (1999).

## *STATUTORY AUTHORITY*

Rural's principal argument is that the KCC did not have the statutory authority to, *sua sponte,* reduce Rural's KUSF distribution in response to a tariff filing. We agree.

Unquestionably, the KCC has the authority to modify KUSF distributions, as it did following Rural's audit docket. Generally, the agency was given full power by the legislature to supervise and control telecommunications companies and to "do all things nec-

essary and convenient for the exercise of such power, authority and jurisdiction." K.S.A. 66-1,188. Specifically, the legislature, in enacting the KTA, delegated a number of obligations to the KCC, including the requirement for the KCC to "establish the Kansas universal service fund . . . and make various determinations relating to the implementation of such fund." K.S.A. 66-2002(h). K.S.A. 66-2008 instructs the KCC on the operation of the KUSF. That statute provides, in pertinent part:

"(c) The commission shall periodically review the KUSF to determine if the costs of qualified telecommunications public utilities . . . to provide local service *justify modification of the KUSF*. If the commission determines that any changes are needed, the commission shall *modify the KUSF* accordingly.

. . . .

"(e) Prior to June 30, 2006, for each local exchange carrier electing . . . to operate under traditional rate of return regulation, all KUSF support, including any adjustment thereto pursuant to this section *shall be based on such carrier's embedded costs, revenue requirements, investments and expenses*.

"(f) Additional supplemental funding from the KUSF, other than as provided in subsection (d), may be authorized at the discretion of the commission. However, the commission *may* require approval of such funding to be based upon a general rate case filing. With respect to any request for additional supplemental funding from the KUSF, the commission shall act expeditiously, but shall not be subject to the 120 day deadline set forth in subsection (d)." (Emphasis added.) K.S.A. 66-2008.

The question is whether a tariff application can trigger a modification of the applicant's KUSF distribution. In addition to citing to the general statutory delegation of authority over telecommunications utilities, the KCC points to K.S.A. 66-2008(c) and K.S.A. 66-1,191 as supporting its right to review KUSF distributions in a tariff proceeding.

The mandate contained in K.S.A. 66-2008(c) appears to direct a periodic review and possible modification of the fund, as a whole, rather than each LEC's allowance or distribution from the fund. Obviously, a determination of the "costs" to provide local service would require a determination of the sum of each LEC's cost. However, the provision directs the KCC to revisit local service costs at regular intervals, *i.e.*, periodically, to determine the need to subsidize those costs through the universal service fund. It does

not authorize an ad hoc review of a tariff applicant's individual KUSF distribution.

"The commission, upon its own initiative, may investigate all rates, joint rates, tolls, charges and exactions, classifications or schedules of rates or joint rates and rules and regulations of telecommunications public utilities." K.S.A. 66-1,191. Curiously, the KCC relies on this provision to support its right to review KUSF distributions in a tariff proceeding. The statute was amended in 1997, after the enactment of the KTA which established the KUSF, but KUSF support was not added to the list of items amenable to *sua sponte* KCC investigation. The KCC avers in its brief that "[t]he KUSF is a targeted subsidy and not a general revenue stream generated through provision of service for any particular company." Thus, by the KCC's own characterization, KUSF support, as a targeted subsidy, does not fit within the category of rates, tolls, and charges subject to spontaneous investigation.

More problematic is the legislature's general delegation of authority over telecommunications public utilities to the KCC, together with the directive that such authority shall be liberally construed and shall include all incidental powers necessary to carry into effect the provisions of the KTA. K.S.A. 66-1,194. The KCC argues that to maintain the integrity of the KUSF, as it is directed to do by K.S.A. 66-2008(e), it must have the authority to insure that Rural does not exceed its revenue requirement (recently established in the audit docket) through revised tariffs that generate excess revenues. It then argues that the only means to accomplish this obligation is to exercise its incidental power to offset estimated future excess tariff revision revenues with a corresponding immediate reduction in KUSF support.

The KCC's argument would be more compelling if it did not have the explicit power to prevent excess tariff revision revenues by substituting lower tariff rates. K.S.A. 66-1,191 and 66-1,193; see *Oilfield Fluid Motor Carriers v. Kansas Corporation Comm'n*, 234 Kan. 983, 984, 677 P.2d 982 (1984) (KCC rejected tariff's proposed 18% increase and allowed only 3% increase); *MAPCO Intrastate Pipeline Co. v. Kansas Corporation Comm'n*, 10 Kan. App. 2d 527, 528, 704 P.2d 989 (1985) (order denying the 7.8% increase re-

quested in proposed tariff; instead KCC granted 4% increase). At oral argument, the KCC explained that it was a public policy decision to indirectly offset the excess revenues through a KUSF reduction, rather than directly address the perceived problem by substituting lower rates. We note that none of the KCC's orders in this case make any reference to such a policy.

All carriers throughout the State that use intrastate access lines must contribute to the KUSF, but they are permitted to pass-through the contributions to their customers, *i.e.*, telephone customers throughout Kansas are subsidizing affordable local telephone service in high-cost rural areas. If the tariff rates had been reduced, Rural's customers would have paid less for the local service calling features and service charges. On the other hand, by reducing KUSF support and approving the higher submitted tariffs, the KCC effected a shift of a portion of the subsidized local service costs from all KUSF contributors to the local service customers.

K.S.A. 66-2001 contains the legislative declaration of public policy, including the goal of providing every Kansan with quality telecommunications services at an affordable price. K.S.A. 66-2005(d) contains provisions to prevent a carrier from receiving subsidy for local rates which fall below the statewide rural telephone company average, thus preventing an unfair shifting of the subsidy burden to urban customers. If the rates are not artificially low, then the KCC has no statutory authority to substitute its public policy determinations for that of the legislature by exercising its incidental powers to manipulate KUSF support in response to a tariff filing.

The KCC's goal of making Rural's tariff revisions "revenue neutral" would have made more sense during the transitional period, when KUSF support was based solely on lost revenue caused by the mandatory reductions in access and toll charges. During that period, the KCC was permitted to increase local service charges to offset a portion of the lost revenue, with the fund picking up the remainder of the deficit. Interestingly, the KCC declined to increase local rates, relying instead on the KUSF to subsidize all of the deregulatory lost revenue. K.S.A. 66-2005(c) mandated revenue neutrality and our Supreme Court upheld that provision as a

permissible, albeit transitory, cost-shifting basis. *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363, 385, 956 P.2d 685 (1998). However, with the posttransition shift to cost-based KUSF subsidies (based on a company's rate base, reasonable operating expenses, and fair rate of return), an increase in local rates no longer directly translates into a corresponding decrease in the KUSF allowance. In offsetting new tariff revenues with cost-based KUSF support, the Commission was comparing apples to oranges. The KCC's argument that its recent audit docket gave it the means to do a revised cost-based KUSF analysis in the tariff proceeding will be addressed below.

The KCC appears to have been motivated by its belief that Rural was attempting to recoup the KUSF support reduction ordered in the audit docket through means other than a rate case, specifically through the supplemental KUSF docket, the rate docket, and the tariff docket. We agree that Rural should not be permitted to use a tariff filing as a substitute for a straightforward request for a rate increase with the requisite analysis necessary to calculate Rural's revenue requirements. Ironically, the KCC did exactly what it says Rural should not do; it converted a tariff filing into a rate case proceeding.

In its tariff docket order denying reconsideration, the KCC said that the audits it performed to effect the change to cost-based subsidies were "conducted as rate case proceedings." K.S.A. 66-2008(e) mandates that any *adjustment* to KUSF support shall also be based on an analysis of a carrier's embedded costs, revenue requirements, investments and expenses, *i.e.*, rate case considerations. Therefore, contrary to the KCC's assertion, if it proposes to adjust KUSF support in a tariff proceeding, it is, by necessity, converting the proceeding into a de facto rate case. Neither the statutes nor the KCC's rules and regulations for class B telephone utilities permit such a conversion. *Cf.* K.A.R. 82-1-231 (requiring a class A telephone utility to submit a summary of rate base, operating income, and rate of return in conjunction with proposed tariffs that will result in a major increase in rates or charges).

Contrary to the KCC's suggestion, it was not necessary to convert the tariff filing into a rate case determination of KUSF support in

order to compensate for the rate increase granted to Rural in the rate docket. K.S.A. 66-2007, under which the Commission granted the local exchange rate increase, specifically provides:

"(c) The commission shall have the right to investigate and determine the reasonableness of an increase in local exchange rates and charges under subsection (b) by any rural telephone company within one year of the time local exchange rates or charges are increased. If the commission determines such rate or charge increases are unreasonable, the commission shall have the authority to order a rate hearing and, after such hearing, shall have the authority to rescind all or any portion of the increases found to be unreasonable." K.S.A. 66-2007(c).

The KCC had the specific statutory means to deal with the impact of the rate increase. As previously noted, it had the statutory authority to directly deal with any excess tariff revision revenues. It did not have the statutory authority to convert the tariff proceeding into a proceeding akin to a rate case.

The KCC made the specific finding that the proposed tariff rates were reasonable. However, the Commission's finding was based upon a contemporaneous reduction of KUSF. The order reducing KUSF support is reversed and the matter is remanded for a determination of the reasonableness of the proposed tariffs in light of our disallowance of the KUSF reduction.

### REASONABLENESS

Even if the KCC would have had statutory authority to convert the tariff proceeding into a rate-case-like KUSF proceeding, the evidence was insufficient to conduct such an analysis. The evidence before the Commission was its audit docket, which determined Rural's revenue requirement in the 1999 test year, to which it simply added the estimated future new tariff revenues. The arbitrary nature of this calculation was aptly described by the Commission itself, in its order denying reconsideration findings, where it stated:

"12. The Commission is reluctant to allow Rural to recover additional revenues without evaluating its rate base, reasonable operating expenses, and appropriate rate of return. If, as suggested, Rural's investment in plant has changed significantly, then Rural should consider filing a new rate case. The Commission recognizes rate case proceedings can be expensive and time consuming, but the thorough analysis involved in those proceedings allows a determination of rates that are fair, just, and reasonable for the company. [Citation omitted.] Without

this thorough evaluation, the Commission is only guessing at whether the KUSF support remains cost based in light of estimated increased revenues."

We have no problem finding that the KUSF reduction, based upon a *guess*, was not supported by substantial, competent evidence and, thus, was unreasonable.

Reversed and remanded for further proceedings.