(109 P.3d 194)
No. 92,574

BLUESTEM TELEPHONE COMPANY, *et al., Appellees*, v. KANSAS CORPORATION COMMISSION, *Appellant.*

Opinion filed
April 8, 2005.

*Eva Powers*, assistant general counsel, and *Susan B. Cunningham*, general counsel, of Kansas Corporation Commission, for appellant.

*Thomas E. Gleason, Jr.*, of Gleason & Doty, Chartered, of Lawrence, for appellee Independent Telecommunications Group, *et al.*

*Mark E. Caplinger* and *James M. Caplinger*, of James M. Caplinger, Chartered, of Topeka, for appellee State Independence Alliance.

*James P. Zakoura*, of Smithyman & Zakoura, Chartered, of Overland Park, for appellee WWC License, LLC.

Before HILL, J., MALONE and GREENE, JJ.

HILL, J.: After the deregulation of public utilities in this country, the Kansas Legislature created the Kansas Universal Service Fund (KUSF) that would distribute money to telecommunication companies including rural telecommunication companies that provide telephone service to sparsely populated areas of the state. The Kansas Corporation Commission, charged with overseeing this fund, decided to distribute the fund to rural companies on a per-line basis and not according to "embedded costs" as set out in the statute. A number of rural telecommunication companies comprising the State Independent Alliance (SIA) and the Independent Telecommunications Group (ITG) challenged several orders issued by the Commission on this subject. The district court struck down this per-line method established by the Commission. The Commission appeals these rulings. We agree with the district court's interpretation of the statute in question; it is unambiguous and directs that these funds are to be distributed based on embedded costs.

On the other hand, we hold that the district court had no jurisdiction to carry its ruling over into the area of regulation of carriers of last resort and vacate that order. And finally, in light of our ruling affirming the interpretation of the statute, we think the Commission needs to reassess the issue of whether the KUSF funds are being distributed on a competitively neutral basis as required by law and, therefore, remand that matter to the Commission for further proceedings.

*Statutory Background*

In February 1996, the federal government passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 47

U.S.C. § 151 *et seq.* (2000). The federal act was designed to significantly alter the regulation of the telecommunications industry. The Act proposed to serve the dual purposes of ensuring "universal service" to all regions of the country, including low-income consumers and consumers in high-cost areas, while also encouraging the development of competition in all telephone service markets. 47 U.S.C. § § 251-254 (2000). The federal act required both federal and state agencies to create funds to ensure that universal service was available to all consumers and to ensure consumers in high-cost areas (usually poor and/or rural areas) received services for rates "reasonably comparable" to those services offered in urban areas. 47 U.S.C. § 254(b)(2)-(5). See *Alenco Communications, Inc. v. F.C.C.*, 201 F.3d 608, 614-15 (5th Cir. 2000).

In response, the State of Kansas enacted the Kansas Telecommunications Act (KTA), K.S.A. 66-2001 *et seq.*, in 1996. The public policy goals of the KTA were similar to the two established by Congress: ensure every Kansan had access to first-class telecommunications service at an affordable price; allow consumers throughout the state to realize the benefits of competition; promote consumer access to a full range of telecommunications services; advance development of a telecommunications infrastructure; and protect consumers. K.S.A. 66-2001.

*Regulatory Background of Several KCC Dockets*

Prior to the KTA, local exchange carriers (LECs) subsidized the cost of basic local service by charging higher rates to consumers and other carriers for intrastate tolls and access charges; thus, intrastate access rates implicitly subsidized local service costs. The KTA required the LECs to reduce their intrastate access charges over a 3-year period to a level equal or close to rates charged for interstate access charges. The Commission recognized that if local telephone rates were increased to make up for the lost intrastate access revenues, local phone service might become unaffordable. Accordingly, the KUSF was at first designed to be an explicit subsidy to replace some of these lost revenues and ameliorate the impact of rate increases on local consumers. See *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363, 368-

69, 956 P.2d 685 (1998); *Rural Telephone Service Co. v. Kansas Corporation Comm'n*, 31 Kan. App. 2d 760, 761, 72 P.3d 937, *rev. denied* 276 Kan. 970 (2003). Thus, revenues lost from bringing intrastate and interstate rates into parity were replaced, at least in part, by KUSF payments. *Citizens' Utility Ratepayer Bd.*, 264 Kan. at 375.

After that 3-year transition period, the Commission began working toward making the KUSF payments cost-based. In other words, KUSF payments were to be made based on the amounts needed to cover the LECs' actual prudent costs to provide universal service rather than replacing all revenue lost by imposing rate parity. The present case is a consolidation of appeals from orders in at least three different Commission dockets.

The first Commission docket, the 326 Docket, was the generic docket opened with the goal of establishing an industry-wide policy for a cost-based KUSF payout system. The record of this docket is extensive and involves a broad range of issues not relevant to the issues in this appeal. The relevant issues involve the Commission's requirement that KUSF payments be paid on a per-line basis to rural carriers and, to a limited extent, KUSF portability (meaning the KUSF funds one carrier receives would go to another carrier who takes over the customer).

Toward the completion of the 326 Docket, the Commission started another generic docket involving only rural LECs: the 068 Docket. That docket was resolved by a Stipulation and Agreement proposed by the parties and adopted by the Commission. Immediately thereafter, the 2002 legislature enacted Substitute for House Bill 2754; the key provision in this amendment was codified in K.S.A. 66-2008(e) and must be interpreted in this appeal.

Finally, after the 326 Docket order was appealed to district court, the Commission held its annual hearings about KUSF Year 7 and Year 8 (Dockets 284 and 331). The resulting orders determined the amount each telecommunications carrier must contribute to the KUSF fund to meet the anticipated need for monies to distribute to qualifying LECs.

*District Court Action*

In challenging the Commission's various orders the SIA/ITG argued that paying KUSF on a "portable" per-line basis violated both

K.S.A. 66-2008(e)—which required KUSF to be paid based on an LEC's embedded costs—and the fundamental policies provided in KUSF statutes. SIA/ITG also asserted the requirement for portability of KUSF payments was misguided and based on faulty assumptions. Finally, SIA/ITG argued the per-line portability requirements violated traditional rate of return regulation principles, failed to address carrier of last resort (COLR) cost recovery requirements, did not provide a competitively neutral mechanism, and, therefore, violated public policy.

In response, the Commission asserted the same issues it now raises in this appeal. Specifically, the Commission argued that K.S.A. 66-2008(e) does not intend that all KUSF payments are to be based on embedded costs and that if the court would construe all the sections of KTA *in pari materia*, it would support the Commission's decisions. The Commission also argued its order was consistent with both statutes (federal and state) and by public policy concerns.

The district court rescinded the Commission's order allowing a per-line distribution of KUSF funds effective March 1, 2003. The court also ordered the Commission to examine the costs of all qualified telecommunications entities providing local service to determine KUSF distributions. The court otherwise affirmed all other portions of the Commission's orders.

In explanation of its orders, the court noted the primary issue turned on the interpretation of K.S.A. 66-2008. After reviewing K.S.A. 66-2008(e), the court agreed with SIA/ITG's arguments that this subsection was unambiguous and mandated consideration of rural LECs' costs before any adjustment could be made to its KUSF payments. The court also noted that enforcing K.S.A. 66-2008(e) as it was clearly written was consistent with the KTA's policy considerations set forth in K.S.A. 66-2001. The court also found accepting the language of K.S.A. 66-2008(e) on its face was consistent with other subsections in K.S.A. 66-2008. In addition, the court found that the provisions of K.S.A. 66-2009, which provide for KUSF payments to COLRs, implicitly reaffirmed the concept that KUSF payments had to be cost-based for COLRs because

they incurred costs in maintaining their facilities regardless of the number of customers actually using them.

Finally, the district court found the Commission's order failed to satisfy the competitively neutral standard of K.S.A. 66-2008(b) because the order allowed distributions to non-LEC carriers without evaluating all the cost/expense information of these companies. Without evaluating each carrier's costs and expenses, the court found the Commission would be "compar[ing] apples to oranges."

*Issues Decided in this Appeal*

The three core issues that we must address are:

1. Was the district court's interpretation of K.S.A. 66-2008(e) correct?
2. Does the embedded cost requirement of K.S.A. 66-2008(e) apply to carriers of last resort governed by K.S.A. 66-2009?
3. Did the district court erroneously order the Commission to audit nonrural phone companies as part of the procedure of deciding the amount of KUSF payments to be made in a competitively neutral manner?

*K.S.A. 66-2008(e) and Embedded Costs*

The district court held that the statute was clear and unambiguous in requiring all adjustments to KUSF support be based on an LEC's embedded costs and revenue requirement. The district court also found this plain reading of 66-2008(e) was not contrary to any other provision of the KTA. Accordingly, the district court reversed the Commission's order requiring that KUSF payments be made on a per-line basis because that could cause a reduction in KUSF payments without considering the embedded costs and revenue requirement of the company. This interpretation also indirectly invalidated the portability provisions in the Commission's order.

The statute in question is K.S.A. 66-2008, which provides:

"On or before January 1, 1997, the commission shall establish the Kansas universal service fund, hereinafter referred to as the KUSF.

. . . .

"(b) Pursuant to the federal act, distributions from the KUSF shall be *made in a competitively neutral manner* to qualified [telecommunications providers], that

are deemed eligible both under subsection (e)(1) of section 214 of the federal act and by the commission.

"(c) The commission shall periodically review the KUSF to determine if the costs of qualified [telecommunications providers] to provide local service justify modification of the KUSF. If the commission determines that any changes are needed, the commission shall modify the KUSF accordingly.

"(d) Any qualified [telecommunications provider] may request supplemental funding from the KUSF based upon a percentage increase in access lines over the 12-month period prior to the request. . . . Additional funding also may be requested [under various specified circumstances]. . . .

"(e) Prior to June 30, 2006, for each local exchange carrier electing . . . to operate under traditional rate of return regulation, *all KUSF support, including any adjustment thereto pursuant to this section, shall be based on such carrier's embedded costs, revenue requirements, investments and expenses.*

"(f) Additional supplemental funding from the KUSF, other than as provided in subsection (d), may be authorized at the discretion of the commission. However, the commission *may* require approval of such funding to be based upon a general rate case filing." (Emphasis added.)

Our scope of review concerning a statutory interpretation is un-limited. Interpretation of a statute is a question of law. An appellate court is not bound by the district court's interpretation of a statute and is obligated to interpret a statute de novo. *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004).

Furthermore, under the doctrine of operative construction, the interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to judicial deference, especially if the agency is one of " ' "special competence and experience." [Citation omitted.]' " *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 247, 75 P.3d 226 (2003). Although given deference, an agency's interpretation of a statute is not binding and the final construction of a statute lies with the appellate courts. *Rural Telephone Service Co.*, 31 Kan. App. 2d at 765. If the reviewing court finds that the administrative body's interpretation is erroneous as a matter of law, the court " 'should take corrective steps.' [Citation omitted.]" *Board of Ness County Comm'rs v. Bankoff Oil Co.*, 265 Kan. 525, 537, 960 P.2d 1279 (1998).

The statute is not ambiguous. Subsection (e) of K.S.A. 66-2008 applies only to rural LECs that continue to operate on a rate of

return basis. This subset of LECs must have their KUSF distribution computed on their embedded costs, revenue requirements, investments, and expenses. The two flanking provisions of the law, subsections (d) and (f), apply to all qualified carriers. More significantly, subsection (e) clearly limits the methodology for supplemental funding for rural carriers under (d) and (f) by explicitly stating "all KUSF support, *including any adjustment thereto pursuant to this section*, shall be based on such carrier's embedded costs . . . ." (Emphasis added.) Although subsections (d) and (f) seem to incorporate provisions to KUSF adjustments without requiring consideration of "embedded costs," these provisions are not inconsistent with subsection (e) because they apply to the larger set of carriers.

The fundamental rule of statutory construction is that the intent of the legislature governs when that intent can be ascertained from the statute. *In re Doe*, 277 Kan. 795, 800, 90 P.3d 940 (2004). We agree with the district court when it stated that this "language is not equivocal. Any adjustment in support means an increase or decrease. It appears the legislature acknowledges that there must be recognition of the cost factors in addition to the per-line access issues."

On appeal, the Commission challenges the district court's interpretation of K.S.A. 66-2008(e), contending the statute "plainly does not require a full determination of costs for every single adjustment of support but instead allows adjustments consistent with the clear language of other subsections of K.S.A. 66-2008." The Commission asserts the language of 66-2008(e), when construed with other subsections of the section, was ambiguous requiring consideration of legislative history.

The trouble with this argument is that we are bound to implement the intent as it is expressed in the statute itself:

"An appellate court may consider various aspects of the statute in attempting to determine the legislative intent. The court must first look at the intent as expressed in the language of the statute. *When the language is plain and unambiguous, an appellate court is bound to implement the expressed intent.* [Citation omitted.] *Ordinary words are to be given their ordinary meanings without adding something that is not readily found in the statute or eliminating that which is*

*readily found therein.* [Citation omitted.]" (Emphasis added.) *State v. Manbeck,* 277 Kan. 224, 227, 83 P.3d 190 (2004) (interpreting statute involving the driving under the influence of alcohol *and* drugs to mean what it said; declining to interpret the "and" to be an "or").

We see no reason to examine the legislative history when the meaning of the passage is so clear.

The Commission also contends that its interpretation of 66-2008(e) is more consistent with subsections (b), (d), and (f) of that statute. Subsection (b) simply requires KUSF distributions to be made in a "competitively neutral manner." In its order, however, the Commission concluded that paying ETCs that enter the market the same KUSF amount paid to the incumbent LECs was competitively neutral in that it rewarded the ETCs if they were more efficient and innovative. Thus, the "competitively neutral" view the Commission adopted in its own order focused paying the ETCs the same amount LECs received. Based on the Commission's own order, *how* the LECs' payments were calculated was not relevant to the competitively neutral standard.

The Commission also argues that subsection (d)'s mechanism to allow LECs to obtain adjustments to KUSF if they increase the number of their access lines reflects that a complete calculation of costs would not be necessary for all KUSF adjustments. Subsection (d) allows qualified telecommunications carriers to request supplemental funding based upon an increase in access lines over the prior year and various other reasons specified by the statute; simplified filing procedures are allowed for this process. Subsection (d) simply establishes (1) events that can trigger the right to request additional funding and (2) identifies the simplified process through which such a request may be made. Similarly, subsection (f) simply gives the Commission the authority to allow additional supplemental funding in the agency's discretion; such a request *may* be subjected to the filing of a general rate case.

An administrative agency only has the authority granted to it by the legislature. To be valid, administrative agency rulings must be within the statutory authority conferred upon the agency and must be appropriate, reasonable, and not inconsistent with the law. Those actions that go beyond the statutory authorization violate

the statute or are inconsistent with the statutory powers of the agency are void. *In re Tax Appeal of City of Wichita*, 277 Kan. 487, 495, 86 P.3d 513 (2004). Even though the Commission's decision was otherwise reasonable, the restrictions of K.S.A. 66-2008(e) limit the Commission's authority when ordering adjustments to a rural LEC's KUSF support.

For these reasons, the Commission's arguments on appeal about the evidence in the record supporting the reasonableness of the per-line adjustment and public policy concerns do not need to be addressed.

*Carriers of Last Resort and Embedded Costs*

The district court found that the provisions of K.S.A. 66-2009, which provide for KUSF payments to COLRs, implicitly reaffirmed the concept that KUSF payments had to be cost-based for COLRs because they incurred costs in maintaining their facilities regardless of the number of customers actually using them. The court also stated that it was "only logical that costs under K.S.A. 66-2009 equate to embedded costs . . . as allowed in K.S.A. 66-2008(e)."

The district court had no jurisdiction to make such a ruling. No carrier has requested separate KUSF funding for costs associated with its status as a COLR. The Commission's orders challenged in the district court made no determination about KUSF support payments for COLR costs. Consequently, the district court had no jurisdiction to determine how COLR costs must be calculated.

*Ordering Commission to Audit Non-rural Carriers*

The district court also ruled the Commission's order failed to satisfy the competitively neutral standard of K.S.A. 66-2008(b) because the order allowed distributions to non-LEC carriers without evaluating all the cost/expense information of these companies. Without evaluating each carrier's costs and expenses, the court found the Commission would be "compar[ing] apples to oranges."

For this question, we must interpret K.S.A. 66-2008(b). The relevant section states: " '(b) Pursuant to the federal act, distributions from the KUSF shall be *made in a competitively neutral manner* to qualified [telecommunications providers], that are deemed eli-

gible both under subsection (e)(1) of section 214 of the federal act and by the commission.' " (Emphasis added.) Since the KTA does not define "competitively neutral," the Commission's interpretation of this language must be given deference if there is a rational basis for this interpretation. *Rural Telephone Service Co.*, 31 Kan. App. 2d at 765.

The Commission found the statutory requirement of "competitive neutrality" was served by providing equal support for all carriers serving the same market. It reasoned that basing support on each Eligible Telecommunication Carrier's individual actual cost could cause negative consequences and harm consumers by rewarding inefficiencies and would discourage technological improvement and innovation. This reasoning appears to be consistent with the federal model. In the Federal Communications Commission's (FCC's) implementation of the federal universal service fund, 47 U.S.C. § 254, the FCC issued a detailed order. In that order, the FCC found:

"[T]he least burdensome way to administer the [universal service] support mechanism will be to calculate an [incumbent LEC]'s per-line support by dividing the ILEC's universal service support payment . . . by the number of loops served by that ILEC. That amount will be the support for all other eligible telecommunications carriers serving customers within the ILEC's study area.

"We are not persuaded by commenters that assert that providing support to CLECs [competitive LECs] based on the incumbents' embedded costs gives preferential treatment to competitors and is contrary to the Act and the principle of competitive neutrality. While the CLEC may have costs different from the ILEC, the CLEC must also comply with Section 254(e), which provides that '[a] carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended.' . . . If a CLEC can serve the customer's line at a much lower cost than the incumbent, this may indicate a less than efficient ILEC. The presence of a more efficient competitor will require that ILEC to increase its efficiency or lose customers." *In the Matter of Federal-State Joint Board on Universal Service*, 12 FCC Rcd 8776, 8933 (1997), *affirmed in part and reversed in part Texas Office Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999).

But we are not satisfied that this takes care of the issue. K.S.A. 66-2008(e) was enacted after the Commission's ruling on how KUSF payments will be calculated. In oral arguments, the Commission conceded the district court's interpretation of the statute

will affect the size of the fund and the competitively neutral manner in which it is to be distributed. We believe the Commission must take a look at this matter again especially in light of our ruling upholding the district court's interpretation of K.S.A. 66-2008(e).

We affirm the district court's interpretation of K.S.A. 66-2008(e) and uphold the part of the order striking down the per-line adjustment of KUSF for rural LECs. We vacate that portion of the district court's order interpreting K.S.A. 66-2009. We reverse that part of the order requiring the Commission to calculate KUSF payments to non-incumbent and non-Rate of Return carriers based on the individual company's embedded costs and remand the issue to the Commission for further proceedings concerning the competitive neutrality of the KUSF distribution in light of our interpretation of K.S.A. 66-2008 (e).

Affirmed in part, vacated in part, reversed in part, and remanded with directions.