No. 112,364

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BLUESTEM TELEPHONE COMPANY, *et al.*,
*Appellants*,

v.

KANSAS CORPORATION COMMISSION,
*Appellee*,

and

SPRINT COMMUNICATIONS COMPANY, L.P., *et al.*,
*Intervenors/Appellees*.

SYLLABUS BY THE COURT

1.

The party asserting that an agency's actions are invalid bears the burden of proving their invalidity.

2.

Under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.*, a court reviewing an administrative action shall grant relief only if it determines that the agency violated one or more of the provisions listed in K.S.A. 2014 Supp. 77-621(c)(1)-(8). On appeal, an appellate court exercises the same statutorily limited review of an agency's action as does the district court, *i.e.*, as though the appeal had been made directly to the appellate court.

3.

A Kansas court owes no deference to a state agency's interpretation of a federal statute or regulation that such agency is charged with implementing. A court's standard of review is unlimited in such instances.

1

4.

Congress may preempt a state law through federal legislation. It may do so through express language in a statute. But where a statute does not refer expressly to preemption, Congress may impliedly preempt a state law, rule, or other state action.

5.

Congress may impliedly preempt state law either through field preemption or conflict preemption. Field preemption exists when Congress intended to foreclose any state regulation in the area, irrespective of whether state law is consistent or inconsistent with federal law. In such situations, Congress has forbidden the State to take action in the field that the federal statute preempts. Conflict preemption exists where compliance with both state and federal law is impossible or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

6.

In the absence of express preemption, there is a strong presumption that Congress did not intend to displace state law. Moreover, the conflict between the two laws must be positive and direct in order to make coexistence of the two laws an impossibility. It is necessary that the state law in its application to the same field contravene federal public policy or cause a different result or consequence.

7.

The Federal Communications Commission's Transformation Order does not expressly or impliedly preempt K.S.A. 2014 Supp. 66-2005(c)(1) during the 9-year transition period.

8.

An administrative agency's order is lawful as long as the order falls within the statutory authority of the agency and the prescribed statutory and procedural rules are

followed in making the order. An agency's order is considered reasonable if it is supported by substantial competent evidence. Any agency's action is arbitrary and capricious if it is unreasonable or without foundation in fact.

9.

The doctrine of ripeness is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. To be ripe, issues must have taken shape and been concrete rather than hypothetical and abstract. Ripeness of a legal issue is required by Article III of the United States Constitution.

Appeal from Washington District Court; KIM W. CUDNEY, judge. Opinion filed November 25, 2015. Reversed in part, vacated in part, and remanded with directions.

*J. Nick Badgerow* and *Barry L. Pickens*, of Spencer Fane Britt & Browne LLP, of Overland Park, *Colleen R. Jamison*, of James M. Caplinger, Chtd., of Topeka, *Thomas E. Gleason, Jr.*, of Gleason & Doty, Chtd., of Lawrence, and *Mark E. Caplinger*, of Mark E. Caplinger, P.A., of Topeka, for appellants.

*Brian G. Fedotin*, assistant general counsel/special assistant attorney general, for appellee Kansas Corporation Commission.

*Russell S. Jones, Jr.*, of Polsinelli PC, of Kansas City, Missouri, and *Diane C. Browning*, of Sprint Communications Company, L.P., of Overland Park, for intervenors/appellees Sprint Communications Company, L.P., *et al*.

Before GREEN, P.J., STANDRIDGE and POWELL, JJ.

POWELL, J.: Bluestem Telephone Company and numerous other rural local exchange carriers (RLECs) appeal the district court's order affirming an order from the Kansas Corporation Commission (Commission), altering the manner in which the RLECs would receive support from the Kansas Universal Service Fund (KUSF) in light of a new

3

order from the Federal Communications Commission (FCC) and subsequent state statutory amendments. Because we find that K.S.A. 2014 Supp. 66-2005(c)(1) is not preempted by federal law, at least during the transition period, and that challenges to the Commission's interpretation of K.S.A. 2014 Supp. 66-2008(e)(1) are not ripe for adjudication, we reverse in part, vacate in part, and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

*The 1996 Telecommunications Act*

The Telecommunications Act of 1996 (1996 Act) was passed by Congress in order to further deregulate the telecommunications industry. 47 U.S.C. § 151 *et seq.* (2012); see *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363, 369, 956 P.2d 685 (1998). The 1996 Act was intended to serve the dual purposes of ensuring "universal service" to both low income consumers and consumers in high-cost areas and promoting competition in all markets. 47 U.S.C. §§ 251-254 (2012). The 1996 Act required the federal government to create universal service funds designed to ensure that consumers in high-cost areas received services for rates "reasonably comparable" to those services offered in lower-cost, competitive market areas. 47 U.S.C. § 254(b)(2)-(5); *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, 33 Kan. App. 2d 817, 819, 109 P.3d 194, *rev. denied* 280 Kan. 981 (2005) (*Bluestem I*). States were permitted to adopt their own universal service mechanisms not inconsistent with the federal regulations to support universal service at the intrastate level. 47 U.S.C. § 254(f).

In response, the Kansas Legislature passed the Kansas Telecommunications Act (KTA) in 1996. K.S.A. 66-2001 *et seq.* The KTA's goals matched those of the 1996 Act—ensuring that every Kansan had access to first class telecommunications service at an affordable price while at the same time promoting consumer access in all areas of the state. K.S.A. 66-2001. The KTA ultimately required local exchange carriers (LECs)—or

4

in layman's parlance, local telephone companies—to reduce their intrastate access charges, which had subsidized the cost of basic local service, over a 3-year period to a level equal or close to the rates charged for interstate access. This requirement had the effect of raising local telephone rates while at the same time lowering long distance rates. To prevent local telephone rates from increasing to an unaffordable level, particularly for low income consumers and consumers in high-cost rural areas, the Commission established the KUSF to subsidize LECs. At the end of the 3-year transition period, the Commission provided KUSF subsidies to LECs based on the amounts they needed to cover their actual prudent costs to provide universal service over and above the revenues generated by rates they charged to their customers which they had been required to set at levels reasonably comparable to rates in more competitive urban markets. *Bluestem I*, 33 Kan. App. 2d at 819-20.

Over the years, technology changed, and with it came an increase in the use of wireless telecommunications and broadband data services. In recognition of the changing technological and competitive marketplace, the FCC released the National Broadband Plan (Plan) in March 2010. Through the Plan, the FCC established a roadmap to expand broadband capabilities in the United States. The goal of this expansion was to stimulate economic growth and boost the country's capabilities in education, health care, and government performance. Federal Communications Commission, National Broadband Plan, https://www.fcc.gov/national-broadband-plan. As part of this program, the FCC issued a notice of proposed rulemaking that ultimately resulted in FCC Order No. 11-161. This order became known as the USF/ICC Transformation Order (Transformation Order). *In the Matter of Connect America Fund*, 26 FCC Rcd 17663 (2011). Events leading up to and following the adoption of the Transformation Order triggered the actions leading to this appeal.

5

*The Commission's 170 Docket*

Prior to the finalization of the Transformation Order, the Commission opened an industry-wide docket, No. 12-GIMT-170-GIT (170 Docket), to analyze the potential effects of the Plan and the proposed Transformation Order. The Commission directed the parties involved to address the impact of potential changes planned for the Federal Universal Service Fund (FUSF), the potential impact of proposed intercarrier compensation reform, and other issues related to the FCC's proposed rulemaking.

As noted in its order, the Commission was concerned because Kansas LECs received the third-highest amount of FUSF distributions in the country; accordingly, the Commission was concerned that changes in the FUSF could have a significant impact on those companies. In addition, the Commission wanted to reevaluate the State's priorities in providing communication services in the changing industry. The Commission's order opening the docket specified the various topics it had determined to investigate and requested input from interested parties.

Numerous telecommunications carriers entered appearances in the 170 Docket, including the parties involved in this appeal. Shortly after the Commission initiated the 170 Docket, the FCC issued the final version of the Transformation Order. The Commission took administrative notice of the FCC order.

In March 2012, the Commission issued an order directing interested parties to file prehearing briefs to address their views of the various issues arising from the Transformation Order. In issuing this order, the Commission found that the Transformation Order made a number of changes to the FUSF and intercarrier compensation rules "that could affect the revenues that carriers operating in Kansas receive from the *federal*[] *jurisdictional* services." (Emphasis added.) In addition, the Commission noted that carriers might receive reduced *intrastate* and *interstate* access

6

revenue but gain other types of revenues. The Commission requested the parties brief specific issues set forth in the order.

The various parties presented significantly different perspectives on the issues. Non-LECs expressed concern that KUSF subsidies should be provided in a competitively neutral manner; accordingly, they argued that an LEC should not receive KUSF subsidies any time an unsubsidized competitive carrier was providing universal service in the LEC's territory. One party suggested that any changes to the KUSF should mirror the changes made to the FUSF to avoid any conflict with the federal law. It argued this type of change would ensure LECs would be required to implement the technological reforms intended by the Transformation Order. The RLECs repeatedly argued that because they were rate-of-return companies, the State's failure to ensure KUSF payments paid for embedded costs would amount to an unconstitutional taking of property. Sprint, a large telecommunications carrier that does not provide LEC services but provides wireless services to customers—who, like all intrastate telecommunications carriers, contributes to the KUSF and passes those charges along to its customers—opposed any action increasing KUSF reimbursement. Sprint asserted that nothing in the Transformation Order contemplated or encouraged replacement of funds lost by the federal reforms. Sprint claimed that providing additional KUSF subsidies to substitute for revenues lost under the Transformation Order would be contrary to federal law.

Based upon the myriad of responses and concerns, the Commission ordered LECs and competing LECs to file revised tariffs complying with the Transformation Order's requirement that prices move toward parity between interstate and intrastate *terminating* charges. Several months thereafter, the Commission's Utilities Division (Division) issued a report summarizing the nature and extent of the effects the Transformation Order would have on Kansas telecommunications companies and customers. The Division noted that various portions of the federal reforms—involving Local Interstate Common Line Support, the freezing of FUSF in areas with unsubsidized competitive carriers, FUSF per

7

line dollar limits, and below-benchmark local rates—would have no effect or only limited impact on RLECs.

The Division recognized, however, that many of the federal reforms would impact RLECs. The Division estimated that the overall impact of the FUSF reforms for RLECs would result in an approximate 3.6% decrease in FUSF support in 2012 (or $4.9 million); approximately 45% of the loss would be the result of lost support to offset *intrastate* costs. At the same time, intercarrier compensation reforms would increase these companies' revenues by $1.26 million. With respect to 2013, the Division estimated that RLECs would lose about $17.5 million of FUSF support while their revenues from intercarrier compensation reforms would increase by $790,000.

Finally, the Division's report mirrored some of Sprint's concerns that the Commission should review existing Kansas law to determine whether it conflicted with the new Transformation Order. Specifically, the Division expressed concern that K.S.A. 2012 Supp. 66-2005(c)—the statutory provision that provides for the KUSF to reimburse RLECs for revenues lost in bringing interstate/intrastate access rates into parity—might conflict with the Transformation Order's transition to a bill-and-keep methodology. Bill-and-keep is a system whereby LECs would "look first to their subscribers to cover the costs of the network, then to explicit universal service support where necessary." Transformation Order, 26 FCC Rcd at 17676, ¶ 34. As a result of the Division's report, the Commission ordered the parties to submit additional briefing on whether K.S.A. 2012 Supp. 66-2005(c) conflicted with the FCC's order.

*The Commission's 004 Docket*

While the 170 Docket was pending, the Commission opened another investigative docket, No: 13-GIMT-004-GIT (004 Docket). Again, based upon the new FCC rules, the Commission decided to investigate whether RLECs' intrastate *switched access* rates

8

should be increased in light of the Transformation Order's capping of intrastate terminating access rates. At this time, RLECs were obligated to file information with the Commission regarding the intrastate switched access rates anyway. The Commission ordered RLECs to file specified data with respect to their intrastate switched access rates and provide comments on the Commission's staff's (Staff) recommendations for future handling of terminating rates, switched access rates, and reduction of KUSF support through the use of an access recovery charge authorized under the Transformation Order.

After the RLECs filed their calculations of access reductions, the Commission issued its order. In compliance with the Transformation Order capping intrastate terminating access rates, the Commission refused to allow RLECs to increase those rates. However, the Commission ordered that RLECs could adjust their intrastate originating access rates as necessary to reach parity with higher interstate rates. The Commission delayed the intrastate access revisions until July 1, 2013, to coincide with the timing of the FCC's order imposing rate reductions. If an RLEC increased its intrastate originating access charges, those increased revenues would reduce its KUSF support. Other issues—such as concerns about revenues from the federal Connect America Fund, access recovery charges, and KUSF recovery for the changes in intrastate terminating access rates—were referred to the 170 Docket.

The RLECs participated in the 004 Docket. They objected to Staff's assertions that losses incurred as a result of the Transformation Order could be recovered from an access recovery charge rather than from the KUSF. They asserted that an access recovery charge was not designed to produce replacement revenue and those payments were limited regardless of the carrier's revenue requirement. The RLECs argued that changing KUSF procedures at this stage was premature due to the numerous challenges to the Transformation Order filed in federal court. Parenthetically, we note that in May 2014, the Tenth Circuit Court of Appeals rejected various challenges to the Transformation Order brought by a number of telecommunications carriers and upheld the

Transformation Order as a valid exercise of the FCC's power. *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014). The RLECs further argued that the Transformation Order and changes recommended by Staff threatened to impact rural customers disproportionately, contrary to federal and state mandates, and impaired their ability to obtain a return on their investments. Significantly, however, none of the RLECs objected to the tariff calculations accepted by the Commission in the 004 Docket or to the KUSF support determinations based upon those revised tariffs.

*House Bill 2201*

While both of these dockets were pending before the Commission, various telecommunications companies, including RLECs, submitted proposed legislation—H.B. 2201—to the Kansas Legislature in February 2013. House J. 2013, p. 138. The original bill called for the creation of a telecommunications study committee and a number of amendments to the KTA, including amendments to K.S.A. 2012 Supp. 66-2005(c) and K.S.A. 2012 Supp. 66-2008. During various committee hearings, RLECs supported the proposed legislation. See House Utilities & Telecommunications Committee Minutes, February 6, 2013, Attachments 6 and 7; Senate Utilities Committee Minutes, March 12, 2013, Attachment 3. Sprint took a neutral stance on H.B. 2201, although it recommended several amendments to the proposed legislation. See House Utilities & Telecommunications Committee Minutes, February 8, 2013, Attachments 4 and 5; Senate Utilities Committee Minutes, March 14, 2013, Attachment 3.

Staff also testified to the relevant legislative committees about H.B. 2201. Although Staff took a neutral viewpoint, it expressed concerns related to the bill's actions in limiting the Commission's ability to regulate certain types of companies or address consumer issues and concerns that some of the proposed amendments to K.S.A. 2012 Supp. 66-2005 might require KUSF to replace each dollar of FUSF support lost by RLECs. Staff also cited to the pending 170 Docket and issues being addressed therein.

10

Finally, Staff expressed concern that the proposed amendment to K.S.A. 2012 Supp. 66-2008(f) would prevent the Commission from implementing FCC reforms. House Utilities & Telecommunications Committee Minutes, February 8, 2013, Attachment 2. Before the Senate Committee, Staff suggested that H.B. 2201, as amended, was inconsistent with FCC reforms and would make it difficult for the Commission to implement those reforms. Senate Utilities Committee Minutes, March 14, 2013, Attachment 1. After various revisions, the legislature adopted an amended version of H.B. 2201 that was signed into law on April 17, 2013. House J. 2013, p. 881.

*The Commission's Final Decision in the 170 Docket*

Six weeks after this legislation was signed into law by the Governor, the Commission issued its initial order in the 170 Docket. The Commission found that part of the amendments adopted in H.B. 2201 resolved some of the issues briefed by the parties. More specifically, the Commission found that after the amendments, K.S.A. 2014 Supp. 66-2008(e)(2) precluded the KUSF from reimbursing RLECs operating as rate-of-return companies for losses incurred because of changes to FUSF support. In addition, the Commission found that RLECs were not entitled to KUSF funds to offset losses caused with the intercarrier compensation reforms because such losses could be recovered from newly authorized access recovery charges and the Connect America Fund. The Commission concluded that K.S.A. 2014 Supp. 66-2005(c)(1) conflicted with the Transformation Order's purposes and was expressly preempted by ¶ 764 of the federal order. See Transformation Order, 26 FCC Rcd at 17916.

In addition, the Commission evaluated the manner in which it calculated the amount of KUSF support for rate-of-return RLECs. In interpreting the language of K.S.A. 2014 Supp. 66-2008(e)(1)—which requires KUSF support "be based on such carrier's embedded costs, revenue requirements, investments and expenses"—the Commission concluded that such costs and revenue requirements only served as the

11

starting point for determining KUSF support. The Commission decided that because the statute did not require support to be based upon "all" embedded costs, such costs would merely be the starting point for determining KUSF support and the Commission was not required to reimburse all embedded costs. The order, however, did not otherwise state whether such calculations would be determined based upon a set percentage of embedded costs or some other process. The Commission denied the motion for reconsideration filed by the RLECs.

*Actions in the District Court*

The RLECs filed a timely petition for judicial review in the Washington County District Court, challenging the Commission's orders in both the 170 Docket and the 004 Docket. The RLECs asserted that the Commission's orders violated the law in depriving them of their right to a rate of return, contrary to K.S.A. 2014 Supp. 66-2005(c)(1), and that the Commission erred in determining the statute was preempted by federal law. The RLECs also requested injunctive relief to preclude enforcement of the order from the 170 Docket. Sprint successfully moved to intervene in the case.

The district court accepted briefing from the parties and heard oral arguments on the issues. The district court ultimately agreed with the Commission. In its opinion, the court discussed the evolution of regulation of RLECs before and after the KTA, summarized the Transformation Order and the Commission's review of the same, and summarized the Commission's subsequent decision in the 170 Docket. After reviewing the Transformation Order, K.S.A. 2013 Supp. 66-2005(c)(1), and federal law, the district court upheld the Commission's determination that K.S.A. 2013 Supp. 66-2005(c)(1) was preempted, either expressly or impliedly. The district court relied on the preemption language of 47 U.S.C. § 251(d)(3) (2012) and determined that the KUSF reimbursement statute stood as an obstacle to the objectives of the Transformation Order's reform of intercarrier compensation and its transition to a bill-and-keep methodology.

12

The district court also addressed the RLECs' challenge to the Commission's interpretation of K.S.A. 2013 Supp. 66-2008(e) that KUSF support be "based on" a carrier's embedded costs and revenue requirements and did not require the KUSF to provide 100% reimbursement for all of an LEC's costs. Further, the RLECs argued that the Commission erred in finding that they had other means to capture revenue and that the reformed federal support mechanisms were inadequate. The district court found that the Commission's interpretation that the statute only requires embedded costs and revenue requirements be the "starting point" for calculating KUSF subsidies was a reasonable interpretation of the statute and that the Commission appropriately considered the Transformation Order and the public policy goals supporting it.

We briefly note that although the district court referred to the 2013 Supplement for 66-2005 and 66-2008, there were no changes to these statutes in the 2014 Supplement.

The RLECs timely appeal.

DID THE DISTRICT COURT AND COMMISSION ERR IN FINDING THAT
K.S.A. 2014 SUPP. 66-2005(C)(1) WAS PREEMPTED BY THE
FCC'S TRANSFORMATION ORDER?

A.    *Standard of Review*

The RLECs are challenging the Commission's decisions under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.* See also K.S.A. 66-118a(b) (judicial review of the Commission's decisions in non-rate cases to be in accordance with K.S.A. 77-609). As the parties asserting that the Commission's actions are invalid, the RLECs bear the burden of proving their invalidity. See *Clawson v. Kansas Dept. of Agriculture*, 49 Kan. App. 2d 789, 795, 315 P.3d 896 (2013). Under the KJRA, "a court reviewing an administrative action shall grant relief only if it determines that the agency violated one

13

or more of the provisions listed in K.S.A. 2012 Supp. 77-621(c)(1)-(8)." 49 Kan. App. 2d at 795. "On appeal, we exercise the same statutorily limited review of the agency's action as does the district court, *i.e.*, '"as though the appeal had been made directly to this court."'" *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 611, 132 P.3d 870 (2006) (quoting *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 245, 75 P.3d 226 [2003]).

The RLECs assert that the Commission erroneously interpreted or applied the law; specifically, they argue that the Commission erroneously concluded that federal law preempted K.S.A. 2014 Supp. 66-2005(c)(1) and their statutory right to receive support from the KUSF. With respect to the Commission's interpretation of federal and state statutes, contrary to the district court's statement that we owe deference to an agency's interpretation of a statute that such agency is charged with implementing, our standard of review is unlimited and no such deference is to be given. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013) ("doctrine of operative construction" repudiated). This notwithstanding, the Commission, relying on *Muir v. Kansas Health Policy Authority*, 50 Kan. App. 2d 854, 334 P.3d 876 (2014), and *Ritter v. Cecil Cty. Office of Hous. & Cmty. Dev.*, 33 F.3d 323 (4th Cir. 1994), argues that we should give some level of deference to its interpretation of federal law.

Before turning to those cases, we note that the standard of review used by the federal courts in cases questioning an agency's interpretation of federal law differs from the standards currently applied in Kansas concerning the interpretation of Kansas law. As stated by Justice Antonin Scalia:

> "'When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.' [*Chevron U.S.A. v. Natural Res. Def. Council*,] 467 U.S. [837,] 842, 104 S. Ct. 2778[, 81 L. Ed. 2d 694 (1984)]. First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken

14

to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' *Id.*, at 842-843. But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.' *Id.*, at 843." *Arlington v. FCC*, 569 U.S. ___, 133 S. Ct. 1863, 1868, 185 L. Ed. 2d 941 (2013).

While we owe deference to the FCC's interpretation of federal law, the Commission cites cases urging us to give it deference in its interpretation of federal law. However, we find the cases relied upon by the Commission to be unpersuasive. *Muir* involved a challenge to a state agency's Medicaid manual developed to implement federal Medicaid statutes. The *Muir* court granted deference to the agency's guidance manual because it involved the agency's interpretation of federal law "as contained in a *federally approved* manual or guidance document." (Emphasis added.) 50 Kan. App. 2d at 857-58. *Ritter*, similarly, involved local agency procedures adopted in implementing a federal program. The *Ritter* court, in granting some deference to the agency's interpretation, relied on cases where federal courts had given deference to federal agency interpretations of federal laws. 33 F.3d at 327-28. We decline to give deference to the Commission's interpretation of the relevant statutes and orders because our Supreme Court has unequivocally mandated that our duty is to review relevant statutes without according any deference. *Douglas*, 296 Kan. at 559. Accordingly, while deference is to be given to the FCC's interpretation of federal law, our review of the Commission's interpretation of the Transformation Order and relevant state and federal statutes is unlimited.

B.    *Principles Regarding Preemption*

Because the Commission's orders are based, in part, upon federal preemption of Kansas law, a review of the law of preemption is in order. The United States Supreme Court recently reiterated the principles of federal preemption:

15

"The Supremacy Clause provides that 'the Laws of the United States' (as well as treaties and the Constitution itself) 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' Art. VI, cl. 2. Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation. *It may do so through express language in a statute*. But even where, as here, a statute does not refer expressly to pre-emption, *Congress may implicitly pre-empt a state law*, rule, or other state action. See *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64, 123 S. Ct. 518, 154 L. Ed. 2d 466 (2002).

"It may do so either through 'field' pre-emption or 'conflict' pre-emption. As to the former, Congress may have intended 'to foreclose any state regulation in the area,' irrespective of whether state law is consistent or inconsistent with 'federal standards.' *Arizona v. United States*, 567 U.S.___, ___, 132 S. Ct. 2492, 2502, 183 L. Ed. 2d 351 (2012) . . . . In such situations, Congress has forbidden the State to take action in the field that the federal statute pre-empts.

"By contrast, conflict pre-emption exists where 'compliance with both state and federal law is impossible,' or where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."' *California v. ARC America Corp.*, 490 U.S. 93, 100, 101, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989). In either situation, federal law must prevail." (Emphasis added.) *ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. __, 135 S. Ct. 1591, 1594-95, 191 L. Ed. 2d 511 (2015).

Our Supreme Court has stated that "'[i]n the absence of express preemption, there is a strong presumption that Congress did not intend to displace state law.'" *Doty v. Frontier Communications, Inc.*, 272 Kan. 880, 891, 36 P.3d 250 (2001) (quoting *Graham v. Wyeth Laboratories*, 666 F. Supp. 1483, 1489 [D. Kan. 1987]). Moreover, the court has stated "that the conflict between the two laws must be positive and direct in order to make coexistence of the two laws an impossibility. It is necessary that the state law in its application to the same field contravene federal public policy or cause a different result or consequence." 272 Kan. at 891. We exercise unlimited review over questions of whether

16

federal preemption applies in a particular case. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 940, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

C.      *Does the 1996 Act Expressly Preempt K.S.A. 2014 Supp. 66-2005(c)(1)?*

The 1996 Act imposed obligations on telecommunications carriers to provide universal service for telecommunications service across the country. 47 U.S.C. § 254 (2012). The 1996 Act sets forth various principles for the preservation and advancement of universal service, including service quality standards, assurances of just and reasonable rates, ensuring access to advanced services to all parts of the country, requiring equitable contributions by all telecommunications carriers to support universal service, and access to advanced telecommunications services for education. 47 U.S.C. § 254(b). With respect to state regulations, the 1996 Act states:

> "*A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service.* Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for *additional definitions and standards to preserve and advance universal service within that State* only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards *that do not rely on or burden Federal universal service support mechanisms*." (Emphasis added.) 47 U.S.C. § 254(f).

Although section 254(f) did not mandate states to switch from implicit subsidies to explicit subsidy mechanisms for carriers within their jurisdictional authority, *Qwest Communications Intern., Inc. v. F.C.C.*, 398 F.3d 1222 (10th Cir. 2005), states were encouraged to find support mechanisms to assist with rate reforms as long as the state plans were consistent with federal law. The 1996 Act clearly contemplated a partnership

17

between federal and state governments to support universal service. See, *e.g.*, 47 U.S.C. § 254(b)(5) ("There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service."); 47 U.S.C. § 254(f) ("Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State."); *Qwest Corp. v. F.C.C.*, 258 F.3d 1191, 1203 (10th Cir. 2001). Therefore, we cannot conclude that the 1996 Act expressly preempts state law in the area of universal service subsidies.

D.      *Does the Transformation Order Preempt K.S.A. 2014 Supp. 66-2005(c)(1)?*

The Commission argues that the reimbursement provision of K.S.A. 2014 Supp. 66-2005(c)(1) is either expressly preempted or impliedly preempted under the conflict preemption standard. The Commission so found in the order it issued in the 170 Docket. The district court found the statute was preempted but did not explicitly determine whether such preemption was express or implied.

Our review fails to show—and the parties fail to point us to any provision—that the Transformation Order *expressly or unequivocally* bars Kansas from providing KUSF or other financial support to LECs impacted by the universal service fund and intercarrier compensation reforms as long as it does not "modify or suspend the federal bill-and-keep regime" contained in the Transformation Order. Transformation Order, 26 FCC Rcd at 17944, ¶ 824. Therefore, we must determine whether the Transformation Order impliedly preempts K.S.A. 2014 Supp. 66-2005(c)(1); this finding turns on whether the statute conflicts with the Transformation Order and stands as an "'obstacle to the accomplishment and execution of the full purposes and objectives'" of the Transformation Order. *Tarrant Regional Water Dist. v. Herrmann*, 656 F.3d 1222, 1241-42 (10th Cir. 2011), *aff'd* 133 S. Ct. 2120 (2013).

18

In order to further carry out the 1996 Act's universal service goals, the Transformation Order determined that intercarrier compensation and the FUSF had to change to more effectively and efficiently achieve the goals of the National Broadband Plan, including transforming today's telephone networks to all-IP (internet protocol) networks. Transformation Order, 26 FCC Rcd at 17872-73, ¶¶ 648, 655. To encourage the expansion of broadband and mobility coverage into areas where such services still did not exist and to encourage current carriers to modernize the telecommunications system, the FCC determined that the industry had to change to a bill-and-keep system. Transformation Order, 26 FCC Rcd at 17872-73, 17904, ¶¶ 648, 650, 736. In other words, a carrier must first look to its own subscribers to cover the costs of the network and only then receive explicit universal service support where necessary. The FCC abandoned the calling-party-network-pays model that dominated intercarrier compensation regimes of the last century. Transformation Order, 26 FCC Rcd at 17676, 17904, ¶¶ 34, 737. Intercarrier compensation charges are paid from one telecommunications carrier to another to originate, transport, and/or terminate telecommunications traffic. Intercarrier compensation payments include access charges and reciprocal agreements.

In discussing its intercarrier compensation reforms and the transition to the bill-and-keep methodology, the FCC specifically discussed the overlapping federal and state roles. One option the FCC considered was permitting the states to set the transition and recovery mechanism for intrastate charges while the FCC would do so for interstate charges; the FCC would also provide FUSF to offset LECs' reduced interstate revenues. The second option considered was for the FCC to determine the transition path for both interstate and intrastate traffic, while assuming "the burden" of FUSF recovery for both interstate and intrastate revenues lost due to reform. Transformation Order, 26 FCC Rcd at 17928, ¶ 788.

The FCC ultimately concluded that a uniform, national framework was the best option for transitioning intercarrier compensation to a bill-and-keep methodology; concomitantly, the FCC would provide an accompanying *federal recovery mechanism, including recovery of intrastate losses*, because states would not set the transition for intrastate rates. "Doing so takes a potentially large financial burden away from the states." Transformation Order, 26 FCC Rcd at 17929, ¶ 790. "[The FCC's] recovery mechanism will provide carriers with recovery for reductions to eligible interstate *and* intrastate revenue. As a result, states will not *be required* to bear the burden of establishing and funding state recovery mechanisms for intrastate access reductions." (Emphasis added.) Transformation Order, 26 FCC Rcd at 17932, ¶ 795. This language suggests the Commission was correct that the Transformation Order preempts K.S.A. 2014 Supp. 66-2005(c)(1).

The crux of the issue is whether this latter provision—that the FCC's recovery mechanism would assist with both interstate *and* intrastate revenue losses and that states will not be required to fund state recovery mechanisms—actually bars states such as Kansas from assisting with the recovery of *intrastate* revenue losses despite the creation of the Connect America Fund and the allowance of access recovery charges.

At the same time, however, the FCC determined that the FUSF system established with the 1996 Act was not effective in encouraging the best technological expansion by carriers receiving support for high-cost areas. The Transformation Order established a support budget and altered the FUSF program to control costs and improve accountability by ensuring that high-cost support mechanisms were able to verify that federal funding was used for its intended purposes and accomplishing the intended results. Transformation Order, 26 FCC Rcd at 17679, ¶ 46. One of the goals of the reformed FUSF was to provide universal service without imposing an excessive burden on consumers and businesses that ultimately pay to support the fund. Transformation Order, 26 FCC Rcd at 17682, ¶ 57.

20

Consequently, the Transformation Order significantly altered how eligible telecommunications carriers received universal service subsidies. The Transformation Order replaced the FUSF with two other support mechanisms: the Connect America Fund (CAF) and, as we have previously noted, an access recovery charge. The CAF would be funded by the federal government. To ensure the funds were expended in areas where there were currently no services, the CAF did not provide support in areas where unsubsidized competitors were providing broadband meeting FCC standards, ensuring that CAF support would be provided only in areas where a federal subsidy was necessary to ensure the build-out and operations of such networks. Transformation Order, 26 FCC Rcd at 17673, 17827, ¶¶ 24, 503. Rate-of-return RLECs would not be entitled to CAF support *unless they offered broadband services of the quality required by the Transformation Order* to any customer in their service area upon reasonable request. Transformation Order, 26 FCC Rcd at 17674, ¶ 26. LECs may also recover losses due to the reduced terminating access fees through a monthly access recovery charge to their customers. Under the access recovery charge process, the LEC may increase residential and business line rates through incremental price increases to those customers. Transformation Order, 26 FCC Rcd at 17677, ¶ 36.

Although the FCC created these alternative support mechanisms, it recognized that these intercarrier compensation reforms were not revenue neutral: access recovery charges and the CAF would not totally replace lost revenues caused by the reforms in light of the changing nature of services customers seek. Transformation Order, 26 FCC Rcd at 17678, ¶ 38. The Transformation Order specifically stated that when subsidies were necessary, they would come "from the [CAF], *and/or state universal service funds*." (Emphasis added.) Transformation Order, 26 FCC Rcd at 17904, ¶ 737. Although various RLECs, including some of the parties in this case, objected to this portion of the proposed Transformation Order, the FCC determined that any claimed potential threats to financial viability for these companies would be evaluated on a case-by-case basis. Parties concerned about their financial viability could file a petition for waiver to show the FCC

that additional assistance was needed to ensure service was provided. Transformation Order, 26 FCC Rcd at 17839, ¶ 539 & n.901; see also *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) (detailed summary of the Transformation Order contained therein).

Therefore, although the Transformation Order adjusted the federal-state relationship in telecommunications regulation, it did not abolish the two-tier system. In fact, early in the Transformation Order, the FCC recognized that "[universal service funds] and [intercarrier compensation] are both hybrid state-federal systems" and that these programs will evolve and "traditional roles [will] shift." Transformation Order, 26 FCC Rcd at 17671, ¶ 15. In discussing the bill-and-keep process, the Transformation Order noted that when additional subsidies are necessary, "such subsidies will come from the [CAF], *and/or state universal service funds*." (Emphasis added.) Transformation Order, 26 FCC Rcd at 17904, ¶ 737.

In recognition of the significant change in the recovery mechanism under the Transformation Order, the FCC granted rate-of-return carriers—such as the RLECs—9 years to transition to a complete bill-and-keep system. Transformation Order, 26 FCC Rcd at 17676, 17905, ¶¶ 35, 739. The revised recovery mechanisms for these carriers incentivized them to invest in more efficient technology, alter their operations to create more efficiencies—such as sharing switches—and ensure their customers do not pay below-market rates. Transformation Order, 26 FCC Rcd at 17983, ¶ 900. The Transformation Order was also concerned with the risk of unconstrained escalation of the CAF by burdening end-user customers and universal service contributors. Transformation Order, 26 FCC Rcd at 17985, ¶ 903. It noted that over time, the total high-cost support for rate-of-return carriers had increased, while such support for carriers that had moved to price cap regulation had declined. Transformation Order, 26 FCC Rcd at 17985, ¶ 903, n.1763. All this pointed to a lack of intent to completely preempt state universal service funding.

Moreover, in support of their claim that the FCC did not intend to preempt KUSF funding to ameliorate the effects of the Transformation Order, the RLECs cite to an order released by the FCC on August 7, 2014, to the Federal-State Joint Board on Universal Service. In that referral, the FCC asked the Joint Board to "provide recommendations on how the Commission should modify the universal service contribution methodology." The request was for the Joint Board to "develop recommendations, with a particular focus on how any modifications to the contribution system would impact achievement of the statutory principle that there be state as well as federal mechanisms to preserve and enhance universal service." *In the Matter of Federal State Joint Board on Universal Service*, 29 FCC Rcd 9784, ¶ 1 (2014).

The RLECs also rely on an order of the Wireline Competition Bureau (WCB), to whom the FCC has delegated the implementation of various facets of the Transformation Order. In *In the Matter of Connect America Fund*, 28 FCC Rcd 5733 (2013), the WCB considered a petition filed by various Texas telecommunications carriers seeking a waiver of the CAF rule capping per-line support to $250 per month, the benchmark rule limiting high-cost loop support, and the rules involving interstate common line support as set forth in the Transformation Order. The WCB dismissed the petitions without prejudice because "alternative remedies and additional support are available through a state process . . . . [and] a number of carriers have already sought relief before the Public Utility Commission of Texas." 28 FCC Rcd 5733, ¶ 1. The WCB went on to state:

> "We commend Texas for creating a process to address any unique concerns for carriers in the state of Texas as a result of recent universal service reforms. We consider these efforts to be a positive development for federal-state coordination and partnership, and encourage other states to consider similar approaches as states may be best positioned to address any unique circumstances for carriers in their state." 28 FCC Rcd at 5733, ¶ 2.

23

In that 2013 case, Texas had adopted a statute which provided a state mechanism for LECs to replace reasonably projected changes in revenue caused by an FCC order or policy change. The statute was designed to replace a change in FUSF revenue or changes in costs or revenue assigned to the intrastate jurisdiction. Tex. Utilities Code Ann. § 56.025(c) (West 2007). The mechanism required an increase in customer rates "if the increase would not adversely affect universal service" or use of the universal service fund. Tex. Utilities Code Ann. § 56.025(f) (West 2007). The Texas case involved payments for costs of specific high-cost physical facility mechanisms. It is unclear from the Texas statutes, however, whether they recognized rate-of-return reimbursement under their regulatory scheme.

Unfortunately for the Commission, its only rejoinder is to attempt in its brief to distinguish the WCB decision because it involved other reforms made under the Transformation Order and emphasize that K.S.A. 2014 Supp. 66-2005(c)(1) is in direct opposition to paragraphs 737 and 790 of the Transformation Order. Undermining the Commission's view, however, is paragraph 737 that states when subsidies are necessary, they will come "from the [CAF], *and/or state universal service funds*." (Emphasis added.) See also Transformation Order, 26 FCC Rcd at 17929, ¶ 790 (the FCC would provide an accompanying *federal recovery mechanism, including recovery of intrastate losses*, taking "a potentially large financial burden away from the states"). At present, the RLECs appear to have the better argument—at least during the transition phase.

At least one other FCC decision seems to acknowledge that state support mechanisms exist to help with revenues lost due to changes made by the Transformation Order. In the FCC report addressing the implementation of the Transformation Order, the FCC rejected arguments that it should increase the high-cost universal service budget in order to better advance broadband deployment in rural areas. The FCC recognized it had to balance the goals of deployment while ensuring an excessive burden was not placed on all ratepayers. *In the Matter of Connect America Fund*, 29 FCC Rcd 15644, ¶ 27 (2014).

24

In addition, the FCC noted that "the states have an important role to play in advancing universal services goals. We welcome and encourage states to supplement our federal funding, whether through state universal service funds or other mechanisms." 29 FCC Rcd at 15644, ¶ 28. In its footnote, the FCC cited 47 U.S.C. § 254(b)(5) and § 257(f) (2012) as permitting states to create and take action to preserve and advance universal service goals. 29 FCC Rcd at 15644, ¶ 28, n.70; see also *Qwest Corp.*, 258 F.3d at 1203 ("The [1996] Act plainly contemplates a partnership between the federal and state governments to support universal service. . . . [and] it is appropriate—even necessary—for the FCC to rely on state action."). Accordingly, it would appear to us that the Transformation Order does not bar Kansas from assisting with the recovery of *intrastate* revenue losses despite the creation of the CAF and the allowance of access recovery charges during the transition period.

However, the question remains as to whether the FCC's concerns in controlling the growth of the CAF or the Commission's desire to more actively push rate-of-return companies to greater efficiencies creates a conflict preemption issue with respect to Kansas statutes. K.S.A. 2014 Supp. 66-2005(c)(1)—the state law at issue—was amended by the legislature after the Transformation Order to state:

> "Subject to the commission's approval, all local exchange carriers shall reduce intrastate access charges to interstate levels as provided herein. . . . Each rural telephone company shall adjust its *intrastate switched access rates* on March 1 of each odd-numbered year to match its interstate switched access rates, subject to the following:
> (1) Any reduction of a rural telephone company's cost recovery *due to reduction of its intrastate access revenue*, except such revenue recovered from another support mechanism, *shall be recovered from the KUSF*." (Emphasis added.)

This statute continues to provide support to rural telephone companies for cost recovery lost due to reduced intrastate access revenue. As the RLECs argue, they have been required under Kansas law to bring their intrastate rates in parity with interstate

25

rates since the KTA was adopted. The Transformation Order's reduction of terminating access revenue and its capping of switching access revenue certainly will have an impact on an RLEC's revenue stream. A logical reading of K.S.A. 2014 Supp. 66-2005(c)(1), however, infers that the RLECs will be required to seek support from the CAF and/or federally allowed access recovery charges before seeking KUSF distributions. Of course, the granting of CAF funds requires the RLECs to expand their broadband service (if they have not already done so). In addition, the Transformation Order expresses concern that "retaining rate-of-return regulation . . . risks 'perpetuat[ing the] isolated, ILEC-as-an island operation,' thus increasing the costs subject to recovery to the extent . . . each individual incumbent LEC purchases its own facilities, rather than sharing infrastructure with other carriers." Transformation Order, 26 FCC Rcd at 17985, ¶ 903.

Based upon the Transformation Order's goals and rationales, we acknowledge it is not unreasonable to conclude that using KUSF dollars to make up for revenues lost due to the Transformation Order stands as an obstacle to the FCC's desire to make telecommunications more competitive, to encourage the distribution of the most highly technological services available, and to encourage efficiencies. This is particularly so since nothing in the record explains why Kansas has so many RLECs for a state of its population and geographic size. Unless these RLECs merge, transition to new technologies, or implement price cap regulations, certainly KUSF fees will continue to climb as long as K.S.A. 2014 Supp. 66-2005(c)(1) is in effect.

However, the recent FCC/WCB opinions seem to lead to a different conclusion. The Transformation Order expressly refused to preempt state obligations regarding *voice service*, including Carrier of Last Resort (COLR) obligations. Transformation Order, 26 FCC Rcd at 17694, ¶ 82. The Transformation Order recommended that each state review its respective regulations in light of the order. Significantly, the Transformation Order states:

26

"[S]tates could consider providing state support directly to the incumbent LEC to continue providing voice service in areas where the incumbent is no longer receiving federal high-cost universal service support or, alternatively, could shift COLR obligations from the existing incumbent to another provider who is receiving federal or state universal service support in the future." Transformation Order, 26 FCC Rcd at 17694, ¶ 83.

Similarly, in discussing bill-and-keep arrangements, the Transformation Order reasoned that to the extent additional revenues are needed beyond end-user payments, "such subsidies will come from [CAF], and/or state universal service funds." Transformation Order, 26 FCC Rcd at 17904, ¶ 737.

Finally, the Transformation Order gave other flexibility to state regulators. Although the Transformation Order affected terminating access rates and capped some other intrastate rates, it did not cap intrastate *originating* access rates for rate-of-return carriers. The Transformation Order noted that states were free to adjust originating access rates but they would be obligated to support any recovery that would be necessitated by that action. Transformation Order, 26 FCC Rcd at 17940, ¶ 813 & n.1529. Similarly, this court has recognized that in calculating an RLEC's entitlement to KUSF support, the Commission has the authority to determine if the company's debts, equity ratio, and expenses are reasonable and prudent. See, *e.g.*, *Wheat State Telephone Co., Inc. v. Kansas Corporation Comm'n*, No. 91,640, 2004 WL 895534, at *10 (Kan. App. 2004) (unpublished opinion) (affirming Commission's determination on return on equity and hypothetical debt/equity ratio).

Based upon the authority the Commission has in ensuring that an RLEC's costs and expenses are reasonable and prudent, and its ability to evaluate any RLEC's claims for KUSF distributions, we conclude K.S.A. 2014 Supp. 66-2005(c)(1) does not provide a significant obstacle to warrant preemption—at least during the transition period. Although not specifically stated in the Transformation Order, the FCC may well have

believed that the needs of LECs would vary from state-to-state and that it was up to the individual states to determine if additional state support was necessary within its boundaries. Absent evidence that KUSF is being used to undermine the FCC's goals of expanding broadband deployment, ensuring more efficiencies as a condition of FUSF support, and transitioning to a bill-and-keep marketplace, we must conclude the Commission and district court erred in finding the Transformation Order preempted state aid mechanisms to assist RLECs in carrying forth with obligations under the Transformation Order. In light of the fact that the federal transition for RLECs is scheduled to take place over 9 years from 2011, it does not appear at present that K.S.A. 2014 Supp. 66-2005(c)(1) is expressly or impliedly preempted by the Transformation Order.

### DID THE DISTRICT COURT AND COMMISSION ERR IN INTERPRETING K.S.A. 2014 SUPP. 66-2008?

The RLECs also take issue with the Commission's ruling that support for rate-of-return carriers in Kansas could be based on less than each carrier's "embedded costs, revenue requirements, investments and expenses" as provided in K.S.A. 2014 Supp. 66-2008(e)(1), asserting that the Commission's action was arbitrary and capricious. In the 004 Docket, the Commission simply concluded that the starting point for calculating KUSF support would be the carrier's embedded costs, etc. The RLECs argue that the $30,000,000 statutory cap adopted in 2012 did not change this requirement and was contrary to this court's prior decision in *Bluestem I*. See *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, 33 Kan. App. 2d 817, 823-24, 109 P.3d 194, *rev. denied* 280 Kan. 981 (2005).

As noted above, a Commission order is lawful as long as the order falls "'within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. [Citation omitted.]'" *Farmland Industries, Inc. v.*

28

*Kansas Corporation Comm'n*, 24 Kan. App. 2d 172, 175, 943 P.2d 470, *rev. denied* 263 Kan. 885 (1997) (quoting *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 3 Kan. App. 2d 376, 380, 595 P.2d 735, *rev. denied* 226 Kan. 792 [1979]). A Commission order "is considered reasonable if it is supported by substantial competent evidence. [Citation omitted.] The Commission's action is arbitrary and capricious if it is unreasonable or without foundation in fact." *Citizens Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 47 Kan. App. 2d 1112, 1124, 284 P.3d 348 (2012). The burden rests with the RLECs to establish the Commission's order is arbitrary or unlawful. See *Clawson v. Kansas Dept. of Agriculture*, 49 Kan. App. 2d 789, 795, 315 P.3d 896 (2013).

The statute in question, amended in 2013, states in relevant part:

"(e)(1) For each local exchange carrier electing pursuant to subsection (b) of K.S.A. 66-2005 . . . to operate under traditional rate of return regulation, all KUSF support, including any adjustment thereto pursuant to this section *shall be based on* such carrier's embedded costs, revenue requirements, investments and expenses. Until at least March 1, 2017, any modification of such support shall be made only as a direct result of changes in those factors enumerated in this subsection. Nothing in this subsection shall prohibit the commission from conducting a general investigation regarding effects of federal universal service reform on KUSF support and the telecommunications public policy of the state of Kansas as expressed in K.S.A. 66-2001 . . . .

"(2) Notwithstanding any other provision of law, no KUSF support received by a local exchange carrier electing pursuant to subsection (b) of K.S.A. 66-2005, and amendments thereto, to operate under traditional rate of return regulation shall be used *to offset any loss of federal universal service fund support for such carrier*, except that such limitation on KUSF support shall not preclude recovery of *reductions in intrastate access revenue* pursuant to subsection (c) of K.S.A. 66-2005, and amendments thereto.

"(3) *Notwithstanding any other provision of law*, the total KUSF distributions made to all local exchange carriers operating under traditional rate of return regulation pursuant to subsection (b) of K.S.A. 66-2005 . . . shall not exceed an annual $30,000,000

cap. A waiver of the cap shall be granted based on a demonstration by a carrier that such carrier would experience significant hardship due to force majeure or natural disaster as determined by the commission." (Emphasis added.) K.S.A. 2014 Supp. 66-2008.

The record shows that the only attempt by the Commission to apply the provisions in K.S.A. 2014 Supp. 66-2008 was its acceptance of the RLECs' adjustments and tariff changes filed in the 004 Docket. Also in that docket, the Commission lowered the estimated contributions due for the next period of KUSF funding. The RLECs have not challenged the reductions imposed, nor have they claimed that the KUSF calculations resulted in subsidies less than their embedded costs and revenue requirements. Significantly, nothing in the orders from the 170 Docket or the 004 Docket states that the Commission intended to limit an RLEC's future recovery to a specific percentage of its embedded costs and revenue requirement.

The RLECs contend, however, that the new interpretation of K.S.A. 2014 Supp. 66-2008 violates the statute and this court's *Bluestem I* decision. The facts in *Bluestem I*, however, were significantly different. In that case, the Commission decided in a generic docket that KUSF distributions would be made on a per-line basis. Towards the end of that docket, the Commission started another generic docket involving only RLECs. That docket was resolved by a stipulation proposed by the parties and adopted by the Commission. After the Commission's decision, the Kansas Legislature codified K.S.A. 2002 Supp. 66-2008(e). 33 Kan. App. 2d at 820.

On appeal of the original docket, this court addressed the meaning of K.S.A. 2002 Supp. 66-2008(e). Contrary to the RLECs' arguments, the court specifically stated that RLECs operating on a rate of return "must have their KUSF distributions *computed on* their embedded costs, revenue requirements, investments, and expenses." (Emphasis added.) 33 Kan. App. 2d at 824. Nothing in *Bluestem I* mandates that KUSF be paid to *fully* fund an RLEC's embedded costs.

30

The RLECs raise a number of arguments that the Commission's ruling would create an absurd result and therefore was an improper interpretation of the statute. They also spend a considerable portion of their brief arguing that the statutory cap may require them to pay an "arbitrary percentage" of an RLEC's embedded costs. This argument appears to us as an anticipated battle against a potential unknown foe. While the Commission argues that such actions might arise due to the new statutory cap on the size of KUSF, none of the parties cite to any regulation or actual action by the Commission to impose an across-the-board percentage in determining an individual RLEC's KUSF entitlement.

It is difficult for us to evaluate the abstract interpretation of a statute in a vacuum. As recognized by our Supreme Court, "issues must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent." *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896, 179 P.3d 366 (2008). "The doctrine of ripeness is 'designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."' [Citations omitted.] To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract. [Citation omitted.]" *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 170, 210 P.3d 105 (2009). The requirement of ripeness of a legal issue is required by Article III of the United States Constitution. See *Morrison*, 285 Kan. at 891-92. This is especially true since the legislature has mandated that until at least March 1, 2017, any modification of KUSF support shall be made only as a direct result of changes in those factors enumerated in this subsection. K.S.A. 2014 Supp. 66-2008(e)(1).

The RLECs also assert that the Commission's current interpretation violates the concept of traditional rate-of-return ratemaking to the point of constituting a taking of the RLECs' property. We are unpersuaded by this argument as it appears to be based upon a faulty premise. While the KTA permitted LECs to choose between price-cap and rate-of-return regulation, the KTA was not premised on the standard monopolistic models of

31

other utility settings. The KTA, like the 1996 Act, was designed to improve competition, not preserve existing monopolies. This court has long recognized that the Commission has authority to determine whether expenses, debt-to-equity ratios, and other cost components are prudently incurred or determined. See, *e.g.*, *Columbus Telephone Co. v. Kansas Corporation Comm'n*, 31 Kan. App. 2d 828, 836, 75 P.3d 257 (2003) (reasonableness of rate case expense); *Wheat State Telephone Co., Inc.*, 2004 WL 895534, at *9 (use of hypothetical debt-equity ratio).

The policies of the KTA, like that of the federal statute, are consumer-focused to ensure that Kansans have access to first-class telecommunications infrastructure at an affordable price, that consumers realize the benefits of competition, that the range of services are comparable in urban and rural areas, and that consumers are protected from practices inconsistent with the public interest, convenience, and necessity. K.S.A. 66-2001. By focusing on encouraging competition, the principles of truly "traditional" rate-of-return ratemaking are not as rigid in the telecommunications industry. The RLECs confuse the requirement that KUSF provide sufficient support for universal service within a market in which telephone service providers compete for customers, which federal law mandates, with a guarantee of economic success for all providers; the latter guarantee conflicts with the federal and state focus on encouraging competition. See *Alenco Communications, Inc. v. F.C.C.*, 201 F.3d 608, 625 (5th Cir. 2000).

Recent amendments to the KTA evidence the legislature's agreement that the "traditional" rate-of-return paradigm is not as fixed in the telecommunications industry. For example, K.S.A. 2014 Supp. 66-2008(e)(2) specifically precludes LECs from recovering revenue losses caused by the Transformation Order *except* for intrastate access revenues recoverable under K.S.A. 2014 Supp. 66-2005(c)(1). Likewise, the statutory cap for the KUSF also signals that there are limits to what subsidies other telecommunications carriers (and their customers) will have to continue to provide to RLECs. See K.S.A. 2014 Supp. 66-2008(e).

Finally, the RLECs fail to establish how the Commission has taken any action to compensate them less than required by the KTA or "traditional ratemaking." Thus, for the reasons we have articulated, the RLECs' challenge to the Commission's rulings regarding reimbursement for their reasonable embedded costs and revenue requirements is not ripe for adjudication. Accordingly, we vacate the district court's order approving the Commission's ruling that support for rate-of-return carriers could be less than each carrier's "embedded costs, revenue requirements, investments and expenses" as provided in K.S.A. 2014 Supp. 66-2008(e)(1) and remand the matter to the district court with instructions for it to dismiss that part of the petition.

The judgment of the district court affirming the Commission's orders is reversed in part, vacated in part, and remanded with directions.